UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

**FILED**

AUG 17 2016



CLERK

|  |  |
|---|---|
| BRUCE LINDHOLM, individually and as personal representative of the ESTATE OF ALEXANDER NELS LINDHOLM, and VANOOSHEH LINDHOLM, individually, | 3:15-CV-03003-RAL |
| Plaintiffs, | OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| BMW OF NORTH AMERICA, LLC, | |
| Defendant. | |

This case is a products liability and wrongful death action brought by Bruce Lindholm, individually and as personal representative of the Estate of Alexander Nels Lindholm, and Vanoosheh Lindholm (collectively "Plaintiffs") against BMW of North America, LLC ("Defendant"), stemming from a tragic accident that occurred on July 5, 2013. Doc. 1-1. Plaintiffs seek monetary relief, including attorney's fees and punitive damages. Doc. 1-1. Defendant moved for summary judgment on all claims, Doc. 28, which Plaintiffs oppose, Doc. 32. For the reasons explained below, Defendant's motion is granted.

## I. PRELIMINARY ISSUES

Defendant complied with Local Rule 56.1(A) of the Civil Local Rules of Practice of the United States District Court for the District of South Dakota by filing a statement of material facts along with their motion for summary judgment. Doc. 42. Local Rule 56.1(B) requires the party opposing a motion for summary judgment, to "respond to each numbered paragraph in the moving party's statement of material facts with a separately numbered response and appropriate

citations to the record." D.S.D. Civ. LR 56.1(B). All material facts set forth by the moving party are deemed admitted "unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. LR 56.1(D). Plaintiffs filed their own statements of undisputed facts, Doc. 33, but did not file a response under Local Rule 56.1(B). Nevertheless, to ensure that the facts are viewed in the light most favorable to Plaintiffs as the non-moving party, this Court draws the facts not only from Defendant's Statement of Undisputed Material Facts, but also from documents supporting Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment where appropriate.

This Court heard oral argument from counsel on June 1, 2016. Docs. 49, 50. At the close of that hearing, this Court stated that because additional discovery was ordered after Defendant filed its motion for summary judgment and in order for the record to be complete, both parties would be permitted to supplement the record with any affidavits or other materials that the parties believed to be important in the Court's consideration of whether there is a genuine issue as to any material fact. Doc. 50 at 40–42; see also Docs. 37, 48. Neither party objected to the Court's acceptance of additional materials at that time. See Doc. 50 at 40–42. Thereafter, Plaintiffs' counsel submitted additional materials opposing Defendant's motion for summary judgment, including an affidavit and "Analysis Summary" from Plaintiffs' expert, Aaron Lalley ("Lalley"), and information surrounding two prior incidents of Storz cantilever jacks apparently failing. Docs. 53, 55-1, 55-2, 55-3, 55-4, 55-5. Defendant now objects to this Court's consideration of that additional information. Defendant first maintains that Plaintiffs failed to submit an affidavit or declaration pursuant to Federal Rule of Civil Procedure Rule 56(d) stating why they could not present the supplemental material earlier. Doc. 57 at 2. Defendant second argues that Lalley's "Analysis Summary" and affidavit should be excluded

2

from the record because the "Analysis Summary"—which Defendant characterizes as a fourth report—was untimely produced and the affidavit is inconsistent with Lalley's previous testimony. Doc. 57 at 1–10.

Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Plaintiffs' counsel submitted an adequate Rule 56(d) declaration in their Brief Pursuant to Federal Rule 56(d) in Further Opposition to Defendant's Motion for Summary Judgment, Doc. 55, and at the oral argument hearing, this Court allowed both parties time to submit additional materials to complete the record before this Court ruled on Defendant's motion for summary judgment, including expert materials. District courts are afforded "great discretion in determining whether to strike expert testimony that is either undisclosed or disclosed in contravention of the court's scheduling order," Sheesley v. Cessna Aircraft Co., No. 02-4185 KES, 2006 WL 3042793, at *4 (D.S.D. Oct. 24, 2006), and the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court . . . to secure the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1. Thus, under Rule 56(d) and in an effort to provide a "just" consideration of Plaintiffs' case, Defendant's objection is overruled, and this Court will consider the supplemental materials submitted by Plaintiffs.

## II. FACTS PERTINENT TO MOTION

On July 5, 2013, twenty-four-year old Alexander Lindholm ("Alex") was attempting to repair an exhaust leak on his 1997 BMW 540i Sedan ("the car"). Doc. 30 at ¶ 1; Doc. 33 at ¶¶ 1–2. The car was inside a storage unit that Alex's father, Bruce Lindholm ("Bruce"), had rented

3

in Pierre, South Dakota for use in repairing and restoring automobiles. Doc. 30 at ¶ 1; Doc. 32-1 at 15; Doc. 32-3 at 32–34; Doc. 33 at ¶ 1. Alex used the jack provided with the car ("Storz cantilever jack")[1] to lift the car and gain access to a hanger that was supporting and securing the exhaust system. Doc. 30 at ¶ 2; Doc. 33 at ¶¶ 2, 5. The exhaust hanger and related components are located underneath and toward the center of the car, not near any of the car's tires. Doc. 30 at ¶ 3.

That afternoon, Alex's friend, Daniel Neugebauer ("Neugebauer"), picked Alex up from the storage unit and the two of them made various stops around town in attempt to find parts to fix the exhaust system. Doc. 32-1 at 18–21; Doc. 33 at ¶¶ 2–3. When Neugebauer picked Alex up from the storage unit, Neugebauer observed that the car was lifted in the back passenger area of the car with the Storz cantilever jack. Doc. 32-1 at 26. Neugebauer testified that Alex said he wanted to use the Storz cantilever jack because it was the manufacturer's jack. Doc. 32-1 at 29. Neugebauer testified that other hydraulic jacks and jack stands were in the storage unit, but on that day, only the Storz cantilever jack was being used to lift the car and that there were no wheel chocks around any of the wheels. Doc. 32-1 at 30, 53. When Neugebauer dropped Alex off at the storage unit after obtaining parts, Neugebauer testified that the car was still supported only by the Storz cantilever jack and that no hydraulic jacks or jack stands were being used. Doc. 32-1 at 34–35. Neugebauer dropped Alex off at the storage unit to make the repairs himself. Doc. 32-1 at 21, 32.

Alex had used only the Storz cantilever jack to lift the car in order to work underneath it on the exhaust system. See Doc. 32-1 at 26–30, 34–35; Doc. 32-3 at 33–34, 37. While Alex was

---

[1] The jack that was provided with the car was manufactured by Storz Company, located in Germany, and is cantilevered in nature, as compared to a diamond jack or scissor jack. Doc. 30 at ¶ 8; Doc. 32-2 at 2–4; Doc. 50 at 7, 27.

under the lifted car making repairs, the Storz cantilever jack somehow tipped, and the car fell on top of Alex. Doc. 32-3 at 32–33; Doc. 33 at ¶ 5. Alex died from asphyxia under the weight of the car. Doc. 32-4. Later that evening, Bruce went to the storage unit to check on Alex. Doc. 32-3 at 32–33. Bruce discovered that the Storz cantilever jack had tipped over and that Alex's body was underneath the car. Doc. 32-3 at 32–33. Bruce used a nearby hydraulic floor jack to lift the car off of Alex's body. Doc. 32-3 at 33. Bruce testified that there were other hydraulic jacks and jack stands in the storage unit, but when he arrived at the unit on July 5, 2013, it did not appear as if Alex had used anything to support the car other than the Storz cantilever jack. Doc. 32-3 at 33–34, 37.

The day before the accident, Bruce had helped Alex work on the car's exhaust issue in the storage unit.[2] Doc. 32-3 at 24–25. On that day, Alex jacked up the car with the Storz cantilever jack and Bruce asked Alex why he was using the Storz cantilever jack. Doc. 32-3 at 24–25. Bruce testified that Alex said the Storz cantilever jack was the "proper jack for the job," and BMW had designated locations or receptacles for the Storz cantilever jack to be used to lift the car off the ground. Doc. 32-3 at 24–25. After jacking the car up with the Storz cantilever jack on the day before the accident, Alex had placed a jack stand under the car and both Alex and Bruce proceeded to work on the car's exhaust issue. Doc. 32-3 at 25.

The Storz cantilever jack was provided with the car to be used for tire repair or replacement and not for work underneath the car. Doc. 30 at ¶ 4. The owner's manual provided with the car instructs that the Storz cantilever jack "is designed for changing tires only" and that one should "[n]ever lie beneath the vehicle or start the engine while the car is supported by the

---

[2] Bruce and Alex are mechanics by hobby and work on cars together from time to time. Doc. 32-3 at 20. Bruce testified that he taught Alex in his early teens how to properly jack up a car and to either use jack stands or blocking so as to prevent injury if the jack were to fail. Doc. 32-3 at 22–23.

jack - risk of fatal injury!" Doc. 30 at ¶ 5; Doc. 29-2 at 1–2. An illustration depicted on the Storz cantilever jack warns that one should not lie under the vehicle while using the Storz cantilever jack. Doc. 31 at 3. Alex was disregarding the instructions in the owner's manual and the illustration on the Storz cantilever jack on July 5, 2013. Doc. 30 at ¶ 7; see also Doc. 32-3 at 53; Doc. 32-10 at 22–25.

Defendant is the distributor of the car. Doc. 30 at ¶ 9. Defendant did not design, test, or manufacture the car or the Storz cantilever jack. Doc. 30 at ¶ 8.

Plaintiffs' expert, Lalley,[3] submitted multiple expert reports in this case including: (1) an expert witness report dated March, 25, 2014; (2) another report dated August 27, 2015; (3) a response to Defendant's expert's report dated November 5, 2015; and (4) an "Analysis Summary" dated November 15, 2015. Doc. 29-1; Doc. 32-11; Doc. 55-1. Lalley also signed an affidavit and was deposed concerning his opinions. Docs. 32-10, 53. At his deposition, Lalley testified that the Storz cantilever jack is not defective, "per se." Doc. 32-10 at 14. Lalley opined, however, that the Storz cantilever jack—and every jack of that particular design—was defectively designed because it represents a "regression in design" and "a significant departure from conventional design" that compromises consumer safety. Doc. 32-10 at 14, 17; see also Doc. 32-11 at 2–3. Lalley cited three factors that contributed to the Storz cantilever jack's functional failure: (1) the base of the Storz cantilever jack is nearly twice as narrow as other conventional jacks; (2) the Storz cantilever jack's upper pivot head was made of plastic, rather than steel; and (3) two polymer castings in the upper pivot "click" together for an interference fit, whereas other conventional jacks are "rigidly pinned" together. Doc. 32-9 at 1–2; Doc. 32-10 at

---

[3] Lalley currently is an instructor at the South Dakota School of Mines and has previous experience in product design and manufacturing. Doc. 32-9 at 3–5; Doc. 32-10 at 4, 7–8; Doc. 55-1.

15, 17–18; Doc. 53 at ¶ 2; Doc. 55-1 at 4–5. In Lalley's opinion, the minimum lateral load that the Storz cantilever jack would be able to withstand while fully extended before becoming unstable is sixty-five pounds. Doc. 32-10 at 15, 17. Lalley then compared the Storz cantilever jack to a scissor jack that had a wider base ("exemplar jack"). Doc. 32-10 at 18–20. Lalley calculated that the exemplar jack would be able to withstand a lateral load of 260 pounds. Doc. 32-10 at 20. Lalley opined that the Storz cantilever jack is "defective and unreasonably dangerous to the consumer" because it "offers increased risk as it has a reduced lateral load requirement an[d] increases consumer responsibility." Doc. 53 at ¶¶ 3–4, 7. Lalley also testified that the Storz cantilever jack needed a complete redesign because consumers do not always use a product under ideal conditions, and he would never rely upon product warnings to ensure consumer safety. Doc. 32-10 at 16, 23–24. Lalley attested that he believed the design choices were made to "save money in material and space," and that he would never approve the design "as it is defective and unreasonably dangerous." Doc. 53 at ¶¶ 3, 5–7; Doc. 55-1 at 5.

Defendant's expert, Michael James ("James"),[4] reconstructed the accident using the same model jack as the Storz cantilever jack and a BMW vehicle similar to Alex's. Doc. 32-13 at 14; Doc. 55-5. James opined that it was unlikely that Alex was able to generate the amount of direct force necessary to tip the Storz cantilever jack because Alex was lying on his back under the car in a position that would have constrained his work area. Doc. 32-13 at 26. According to James, Alex would have been able to generate enough force, however, if he was able to add the car's own momentum by getting the car to rock back and forth.[5] Doc. 32-13 at 26. James opined that

---

[4] James is a mechanical engineer, but he has never worked in product design or manufacturing. Doc. 32-13 at 5.

[5] After the accident, Bruce testified that he got underneath the car and attempted to remove a bolt that was holding a clamp near the exhaust hanger. Doc. 32-3 at 36. The bolt was so tight that during his efforts to remove it, the bolt broke off. Doc. 32-3 at 36. Bruce testified that he did

7

whether the upper pivot was made of plastic or steel or whether the pivot point is rigidly pinned had no effect on the stability of the Storz cantilever jack, other than what the failed jack would look like afterwards; separation of the upper pivot material begins to occur after the jack is forced beyond its point of stability, which Alex would have reached in either case. Doc. 32-13 at 10–12, 31. James also opined that although a wider base may increase the resistance of the Storz cantilever jack to tipping, the size of the Storz cantilever jack's base was not a major factor in the accident. Doc. 32-13 at 20. James noted in his report that the Storz cantilever jack is smaller than conventional jacks but "provid[es] utility while minimizing space and weight." Doc. 32-13 at 22.

Both experts disagreed as to the other expert's final conclusions and calculations, including use of the parking brake, the relative force the other three tires may or may not have provided, and whether the other's overall calculations of force were correct. See e.g., Doc. 32-11; Doc. 32-13 at 11, 31; Doc. 53 at ¶ 6; Doc. 55-1 at 3–4. Of course on ruling on Defendant's motion for summary judgment, this Court resolves those disagreements between the experts in the Plaintiffs' favor.

Plaintiffs submitted evidence of what they believe constitute two prior incidents of the Storz cantilever jack's failure: (1) documents from a case titled Gallimore v. BMW North America, LLC, No. 05-10652-CA-22, filed in the Miami-Dade County Circuit Court in Miami-Dade, Florida,[6] and (2) a BMW Group Special Product Investigation Report that was prepared on

---

not know whether Alex was working on loosening the bolt when the accident occurred. Doc. 32-3 at 36. When James reconstructed the accident, he assumed that Alex "was under the car and that he was applying a load, trying to either loosen a bolt or a nut and he was pulling on it with" significant force. Doc. 32-13 at 27.

[6] Plaintiffs did not submit the entire clerk's case file for Gallimore. Thus, the disposition of the Gallimore case is unclear. During oral argument, Defendant's counsel represented that Gallimore was dismissed on procedural grounds after the complaint was filed. Doc. 50 at 38.

November 27, 2002 in a matter involving customer Chelsey Beaver ("Beaver report") and her 1999 540i BMW. Docs. 55-3, 55-4. Plaintiffs submitted a complaint from Gallimore, a defective design and negligent design products liability action in which Gallimore sought damages for injuries sustained to his hands on September 16, 2003 while using the jack provided with his 525i Sedan purchased in 2002. Doc. 55-3 at 4–6, 10–11. Additional discovery materials show that Gallimore spoke with BMW North America's Customer Relations and stated that at the time of the incident "he was on his knees preparing to install the spare tire on [the] right rear when the vehicle fell forward onto his left hand, completely severing his pinky." Doc. 55-3 at 24. The customer relations log states that Gallimore "believes the jack base is too small to support the vehicle properly and [was] the cause of the vehicle falling." Doc. 55-3 at 24.

The Beaver report totals three pages; the first page is the report itself and the second and third pages consist of photographs. Doc. 55-4. The Beaver report concerns an incident where a BMW owner apparently sustained injuries to his hand when changing a flat tire in an underground parking structure with the vehicle's car jack. Doc. 55-4 at 1. The report states that "[w]hile the car was raised, the top white plastic piece popped off of the jack, causing the car to fall. Mr. Beaver's hand became pinned between the top of the tire and the wheel well." Doc. 55-4 at 1. The jack was inspected, and the report observed that "a piece off of the top of the jack was separated from the jack" and that "[t]he mounting point of the piece has a scrape mark on the end." Doc. 55-4 at 1.

## III. SUMMARY JUDGMENT STANDARD

Defense counsel then argued that consideration of Gallimore by this Court would be improper because the parties are not aware whether misuse or alteration of the product was at issue. Doc. 52 at 38–39.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 places the burden initially on the moving party to clearly establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Id.; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012). "A party opposing summary judgment may not rest upon mere allegations or denials contained in the pleadings, but must, by sworn affidavits and other evidence, set forth specific facts showing that there is a genuine issue for trial." Mehrkens v. Blank, 556 F.3d 865, 868–69 (8th Cir. 2009); see also Mosley v. City of Northwoods, Mo., 415 F.3d 908, 910 (8th Cir. 2005). On summary judgment, courts view the evidence and reasonable inferences in the light most favorable to the nonmoving party. Robbins v. Becker, 794 F.3d 988, 992 (8th Cir. 2015). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc) (internal quotation marks omitted) (quoting Celotex Corp., 477 U.S. at 327).

## IV. DISCUSSION

10

Plaintiffs have alleged Defendant is liable under multiple products liability theories, including strict liability for defective design, negligence and negligent design, wrongful death, and breach of implied warranty. Doc. 1-1. Each theory is analyzed below.

### A. Strict Liability Claim

The Supreme Court of South Dakota adopted the Restatement (Second) of Torts § 402A to govern strict liability cases under South Dakota law. Karst v. Shur-Co., 878 N.W.2d 604, 610 (S.D. 2016; see also Peterson v. Safway Steel Scaffolds Co., 400 N.W.2d 909, 912, (S.D. 1987); Smith v. Smith, 278 N.W.2d 155, 158–59 (S.D. 1979); Engberg v. Ford Motor Co., 205 N.W.2d 104, 204–05 (S.D. 1973). The Restatement (Second) of Torts § 402A provides in full:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>> (a) the seller is engaged in the business of selling such a product, and
>> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
> (2) The rule stated in Subsection (1) applies although
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

"The chief elements [that] a plaintiff must prove in a case involving strict liability in tort are: (1) the defective and unreasonably dangerous condition of the defendant's product, including the defendant's connection with the product, and (2) a causal connection between such condition and the plaintiff's injuries or damages." Kendall v. Bausch & Lomb, Inc., No. CIV. 05-5066-KES, 2009 WL 1740008, at *11 (D.S.D. June 17, 2009) (quoting Brech v. J.C. Penney Co., 698 F.2d 332, 333–34 (8th Cir. 1983) (applying South Dakota law)); see also Nationwide Mut. Ins. v. Barton Solvents, Inc., 855 N.W.2d 145, 150 (S.D. 2014) (quoting Burley v. Kytec Innovative Sports Equip., Inc., 737 N.W.2d 397, 408 (S.D. 2007)); Peterson, 400 N.W.2d at 912. A plaintiff

also must be able to prove that the product at issue was in a dangerous and defective condition when it left the manufacturer, and a defendant cannot escape liability because the defendant "did not know or could not have known of the product's dangerous proclivities." Burley, 737 N.W.2d at 408; see also Peterson, 400 N.W.2d at 912 ("It is the unreasonableness of the condition of the product, not the conduct of the defendant, that creates liability."); Crandell v. Larkin & Jones Appliance Co., 334 N.W.2d 31, 34 (S.D. 1983) (stating that plaintiff's burden of showing defect existed when it left the defendant's hands may be proved with circumstantial evidence). A claim premised on strict liability does not treat defendants as absolute insurers against all injuries; rather, plaintiffs in strict liability actions are simply relieved from proving that the defendant was negligent. Engberg, 205 N.W.2d at 109.

Distributors of a product like the Defendant here may be sued for strict liability. Peterson, 400 N.W.2d at 912 (quoting Restatement (Second) of Torts § 402A(1)); see also Restatement (Second) of Torts § 402A cmt. f. However, South Dakota Codified Laws ("SDCL") § 20-9-9 limits strict liability claims against distributors. SDCL § 20-9-9 provides:

> No cause of action based on the doctrine of strict liability in tort may be asserted or maintained against any distributor, wholesaler, dealer, or retail seller of a product which is alleged to contain or possess a latent defective condition unreasonably dangerous to the buyer, user, or consumer unless said distributor, wholesaler, dealer, or retail seller is also the manufacturer or assembler of said product or the maker of a component part of the final product, or unless said dealer, wholesaler, or retail seller knew, or, in the exercise of ordinary care, should have known, of the defective condition of the final product. Nothing in this section shall be construed to limit any other cause of action from being brought against any seller of a product.

In Peterson v. Safway Steel Scaffolds Co., the Supreme Court of South Dakota interpreted SDCL § 20-9-9 to mean "that a seller may be strictly liable, but only if he knew or through 'ordinary care' should have known of the defective condition of the product. In essence SDCL 20-9-9 says there may be strict liability, but as a matter of proof, knowledge of the defective condition will

not be *imputed* to a nonmanufacturing middleman as would otherwise be the case under strict liability." 400 N.W.2d at 915.

Defendant argues that summary judgment should be granted in its favor on the strict liability claim for three reasons. Defendant maintains that Plaintiffs cannot prove (1) that the Storz cantilever jack was defectively designed; (2) that the Storz cantilever jack caused Alex's damages; and (3) that Alex did not misuse the Storz cantilever jack on the date of the accident. Doc. 31 at 12–16.

Defendant highlights testimony from Plaintiffs' own expert, Lalley, who testified that the Storz cantilever jack is not defective "per se" as proof that Plaintiffs cannot show that the Storz cantilever jack was defective. Defendant also relies on Crawford v. Sears Roebuck & Co., 295 F.3d 884, 885–86 (8th Cir. 2002), where the United States Court of Appeals for the Eighth Circuit held that summary judgment was proper for the defendant-distributor because the plaintiffs' expert was unable to identify any alleged defect with specificity and provided only speculative conclusions. Defendant in making these arguments, however, discounts much of Lalley's testimony and information contained in Lalley's reports and affidavit. Plaintiffs may show that "[a] product is in a defective condition unreasonably dangerous to the user if it could have been designed to prevent a foreseeable harm without significantly hindering its function or increasing its price." N. Star Mut. Ins. Co. v. CNH Am. LLC, No. 11-4133-KES, 2014 WL 897023, at *2 (D.S.D. Mar. 6, 2014) (quoting First Premier Bank v. Kolcraft Enters., Inc., 686 N.W.2d 430, 444–45 (S.D. 2004)). A defect may also be proven by direct or circumstantial evidence, "and a circumstantial case, by itself, is not a bar to a jury determination." Kendall, 2009 WL 1740008, at *11. Here, Lalley opined in writing and in testimony that the Storz cantilever jack was unreasonably dangerous due to its defective design because the Storz

13

cantilever jack's narrow base, material used in the upper pivot head, and interference upper pivot fit rather than one that is "rigidly pinned." Although Defendant's expert, James, disagrees with Lalley's conclusions and calculations, this Court does not weigh the evidence in determining motions for summary judgment. A genuine issue of material fact exists on whether the Storz cantilever jack might be defective, but that leaves questions of whether a genuine issue of material fact remains on the issues of causation and misuse.

Next, Defendant argues that it is not strictly liable because Lalley's testimony is insufficient to support causation. Doc. 31 at 14–15. Defendant points to Lalley's testimony that a side load of up to sixty-five pounds was applied to the Storz cantilever jack, causing the jack to fail, rather than failing as it was statically holding up the car. Doc. 31 at 14–15; Doc. 32-10 at 12. When asked whether Lalley believed that the outside force was applied by Alex, Lalley testified that he did not know, "but it sure seems like that from the police report." Doc. 31 at 15; Doc. 32-10 at 12. Defendant asserts that this testimony is insufficient to prove causation and "scarcely constitutes the required proof that a defect [existed] at the time the subject tire jack 'left the manufacturer.'" Doc. 31 at 15 (internal citation omitted). Defendant also maintains that Alex's injuries were not caused by an alleged defect in the Storz cantilever jack because Alex misused the Storz cantilever jack at the time of the accident. Doc. 31 at 16. Plaintiffs contend that Alex did not misuse the Storz cantilever jack. Doc. 32 at 15–16.

"Causation may be established by circumstantial evidence where that evidence establishes by a preponderance, the probability that the accident was caused by a defect." Crandell, 334 N.W.2d at 34 (citation omitted). Because product liability actions often involve technical issues which lie outside the general knowledge of most jurors, "the fact that an accident occurred is insufficient in and of itself to meet the summary judgment burden of identifying

14

specific facts to support the elements of a plaintiff's product liability claim." Nationwide Mut. Ins. Co., 855 N.W.2d at 150 (internal quotation marks omitted) (quoting Burley, 737 N.W.2d at 410). Thus, "[e]xpert testimony is generally necessary to establish elements of negligence and strict liability . . . 'unless it is patently obvious that the accident would not have happened in the absence of a defect.'" Id. (quoting Burley, 737 N.W.2d at 407). Here, it is not patently obvious that the accident would not have happened in the absence of a defect, and thus expert testimony is necessary to support Plaintiffs' claims. See McKerrow v. Buyers Prods. Co., No. CCB-14-2865, 2016 WL 1110303, at *6 (D. Md. Mar. 22, 2016) (requiring expert testimony to establish that trailer jack was defective because the issues "are too technical for a layman to draw conclusions"); Burley, 737 N.W.2d at 409 (finding that expert testimony was required to aid jury in determining whether alleged defective hook in sports product was the proximate or legal cause of plaintiff's arm injuries).

On summary judgment, a plaintiff "must present more than [u]nsupported conclusions and speculative statements, [which] do not raise a genuine issue of fact." Burley, 737 N.W.2d at 409 (internal quotation marks and quotation omitted). However, a plaintiff does not need to "eliminate all other possible explanations of causation;" rather, it is sufficient that a plaintiff disprove his own misuse. O'Neal v. Remington Arms Co., 913 F. Supp. 2d 736, 740 (D.S.D. 2012) (quoting Crandell, 334 N.W.2d at 34); see also Herrick v. Monsanto Co., 874 F.2d 594, 598–99 (8th Cir. 1989) (applying South Dakota law and finding that plaintiff bears the burden of disproving misuse because misuse is a question of proximate cause). In addition to posing a causation question, misuse is recognized in South Dakota as an affirmative defense. White v. Cooper Tools, Inc., No. CIV. 06-4272-KES, 2010 WL 1329572, at *3 (D.S.D. Mar. 30, 2010) (quoting South Dakota Pattern Jury Instructions: Civil § 20–120–60 (2008 ed.)).

15

"Misuse may involve using a product for an unintended function or using the product for its intended purpose but in an improper manner." Peterson, 400 N.W.2d at 913. "In order for a defendant to prevail on this affirmative defense, it must prove . . . that plaintiff's conduct constituted a misuse, that this misuse was unforeseeable, and that this unforeseeable misuse legally caused the accident." White, 2010 WL 1329572, at *3 (quoting South Dakota Pattern Jury Instructions: Civil § 20–120–60 (2008 ed.)); see also Peterson, 400 N.W.2d at 913 (stating that when a defendant defends a strict liability claim on the basis of misuse, knowledge of all potential misuses is not imputed to the defendant; rather "when a misuse occurs it becomes a question of whether there was 'reason to anticipate' or if it was 'foreseeable'"); Kappenman v. Action Inc., 392 N.W.2d 410, 413 (S.D. 1986) (stating that a plaintiff must "use . . . the product in a manner which the defendant could not reasonably anticipate" to constitute misuse (quotation marks omitted)). A duty to warn applies to those who sell a product; a seller of a product "has a duty not only to warn of dangers inherent in a product's intended use but also to warn of dangers involved in a use which can be reasonably anticipated." Peterson, 400 N.W.2d at 913 (quoting Zacher v. Budd Co., 396 N.W.2d 122, 135 (S.D. 1986)).

The Supreme Court of South Dakota not only follows the Restatement (Second) of Torts § 402A in strict liability cases, but also frequently cites to the comments of § 402A, including the Restatement's comments which address misuse. See, e.g., Peterson, 400 N.W.2d at 913 (citing Restatement (Second) of Torts § 402A cmt. h); Jahnig v. Coisman, 283 N.W.2d 557, 560 (S.D. 1979) (same). Comment h to § 402A of the Restatement (Second) of Torts states that if a defendant in the business of selling a product for use by a consumer "has reason to anticipate that

16

danger may result from a particular use[7] . . . he may be required to give adequate warning of the danger (see Comment *j*), and a product sold without such warning is in a defective condition." Zacher, 396 N.W.2d at 140 (parenthetically noting that manufacturers may have a duty to design safe products for reasonably anticipated misuses (citing Graham v. Joseph T. Ryerson & Sons, 292 N.W.2d 704, 708–09 (Mich. Ct. App. 1980)). Comment j, which, as far as this Court can tell, has not been specifically cited or addressed in South Dakota case law, then provides that "[w]here warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." Restatement (Second) of Torts § 402A cmt. j; see also Restatement (Second) of Torts § 402A cmt. n ("If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.").

In a factually similar case, Barnard v. Saturn Corp., the Indiana Court of Appeals granted summary judgment for the defendants because the decedent misused the vehicle's jack. 790 N.E.2d 1023, 1031 (Ind. Ct. App. 2003). In Barnard, a scissor jack was provided in the trunk of a vehicle and was accompanied by multiple warnings as to its use. In the owner's handbook, on the spare tire cover, and on the jack itself, specific warnings included "use this jack only for changing tires," "[n]ever get under a vehicle when it is supported only by a jack," and "[i]f the vehicle slips off the jack, you could be badly injured." Id. at 1026. The warnings also recommended using blocks and parking the vehicle on a level surface. Id. at 1026–27. The decedent drove the front wheels of the vehicle onto the sidewalk, used the jack to change the

---

[7] Questions of whether misuse by a customer was reasonably foreseeable are ultimately questions reserved for the jury. Peterson, 400 N.W.2d at 913. Here there is no such jury question because a warning was placed on the Storz cantilever jack indicating the manufacturer foresaw and sought to warn against misuse of the jack.

vehicle's oil, and became pinned under the vehicle when the jack failed. Id. at 1027. The Indiana Court of Appeals found that the decedent misused the jack because the undisputed facts showed that the decedent did not park the vehicle on a level surface and used the jack to change the oil (rather than a tire) despite "multiple warnings and instructions" to the contrary. Id. at 1031. The court stated that "[a]lthough it is unlikely, in light of the nature and purpose of a car jack, that [the defendants] could not have reasonably foreseen a user ever deciding to get underneath a vehicle supported solely by a jack, [the decedent] deployed this particular jack in direct contravention of its reasonably expected permitted use." Id. at 1031. In a footnote, the court observed the following:

> If a manufacturer could not foresee a particular use, they would not know to warn against it. Thus, we believe the term "reasonably expected use" must include the manufacturer's reasonably expected permitted use. If not, the moment a seller or manufacturer provided a specific warning against a particular use, they would have admitted to foreseeing use of the product in that proscribed manner.

Id. at 1031 n.3.

In this case, Plaintiffs argue that Alex did not misuse the jack because "Alex was using the jack exactly as it was intended—to lift the vehicle in the 'receptacles' placed on the car by BMW." Doc. 32 at 15. Even if Alex's use was an unintended use of the Storz cantilever jack, Plaintiffs aver that it was a foreseeable misuse because the Storz cantilever jack "would be used to lift the car" and if the jack failed and the lifted car fell, it is foreseeable that an individual under the car would be in the "zone of danger." Doc. 32 at 16.

Contrary to Plaintiffs' assertions, however, even when viewing the facts in a light most favorable to the Plaintiffs, the record establishes that on the date of the incident Alex misused the jack. The Storz cantilever jack was intended to be used to change or replace tires only and not for holding up the car while someone performs undercarriage repair beneath the vehicle. Doc. 29-2; see also 63A Am. Jur. 2d Products Liability § 1290 (stating that foreseeability of misuse

18

"is determined by the realities of the intended and actual use of the product that are well known to the manufacturer and the public"). Similar to Barnard, the undisputed facts show that Alex lifted the vehicle with only the Storz cantilever jack, without using a jack stand, and then got underneath the vehicle to make repairs to the exhaust system in direct opposition to warnings in the owner's manual and on the jack itself.[8] This Court expects that the Supreme Court of South Dakota would apply comment j from the Restatement (Second) of Torts § 402A in a case of this nature, especially given the state court's frequent citation to § 402A and specific citation in Zacher to comment h of § 402A which cross-references comment j. 396 N.W.2d at 140. Because the warnings were provided in the owner's manual and on the Storz cantilever jack, Defendant is entitled to "reasonably assume that [the warnings would] be read and heeded" and thus, the Storz cantilever jack, which Plaintiffs have not proved is unsafe for use if the warnings are followed, "is not in [a] defective condition, nor is it unreasonably dangerous." Restatement (Second) of Torts § 402A cmt. j. Plaintiffs have not pursued a theory that the warnings were somehow deficient.

Plaintiffs have not shown that Defendant should have reasonably expected that Storz cantilever jack users would disregard the warnings provided in the owner's manual and on the jack itself. The evidence Plaintiffs proffer on this point, the case of Gallimore and the Beaver report, does not prove that Defendant knew or should have known that the Storz cantilever jack was defective. First, Gallimore and the Beaver report involve incidents that occurred in 2013 and 2012 respectively, after Alex's vehicle was first sold. See SDCL §§ 20-9-9 & 20-9-10.1;[9]

---

[8] Plaintiffs frequently cited to Peterson v. Safway Steel Scaffolds Co. in their briefing. In Peterson, the Supreme Court of South Dakota found that summary judgment was improper where defendants knew or should have known that its product, on which there were no warnings, was in a defective condition. 400 N.W.2d at 915. In this case, multiple warnings were provided.
[9] SDCL § 20-9-10.1 provides as follows:

Wangsness v. Builders Cashway, Inc., 779 N.W.2d 136, 144 (S.D. 2010) (finding no abuse of discretion where district court instructed jury "to consider whether the product was defective as of the date of sale"); First Premier Bank, 686 N.W.2d at 452 ("The point of time for assessing liability for the defective product in question is the time the product was 'first sold.'" (quoting SDCL § 20-9-10.1)). The Warranty Vehicle Inquiry for Alex's vehicle, Doc. 57-1, indicates that the "Wholesale Date" was August 15, 1996, and the "Retail Date" was October 8, 1996. Plaintiffs have not disputed either of those dates of sale and have not submitted any documents to the contrary.

Second, Plaintiffs have not met their burden of showing that Gallimore and the Beaver report involve incidents that are substantially similar to this case. Evidence of prior incidents or accidents is admissible in a products liability case to prove "the defendant's notice of defects, the defendant's ability to correct known defects, the magnitude of the danger, the product's lack of safety for intended uses, or causation." Sheesley, 2006 WL 3042793, at *11 (quoting Lovett ex rel. Lovett v. Union Pac. R.R., 201 F.3d 1074, 1080 (8th Cir. 2000)). The prior incidents must be substantially similar to the case at hand, meaning the evidence "must be sufficiently similar in time, place or circumstance to be probative." Id. (quoting First Sec. Bank v. Union Pac. R.R., 152 F.3d 877, 879 (8th Cir. 1998)). The party offering such evidence bears the burden of establishing that the "facts and circumstances of the other incident" are admissible in the case before the court. Id. (quoting Drabik v. Stanley–Bostitch, Inc., 997 F.2d 496, 508 (8th Cir.

> In any product liability action based upon negligence or strict liability, whether the design, manufacture, inspection, testing, packaging, warning, or labeling was in conformity with the generally recognized and prevailing state of the art existing at the time the specific product involved was first sold to any person not engaged in the business of selling such a product, may be considered in determining the standard of care, whether the standard of care was breached or whether the product was in a defective condition or unreasonably dangerous to the user.

1993)). Plaintiffs argue that Gallimore and the Beaver report involve the same defective jack failing for the same reasons in this case and show evidence of prior complaints. Doc. 55 at 5–6. But, as stated above, Gallimore and the Beaver report involve incidents that occurred after the sale of Alex's vehicle. Additionally, Gallimore and the Beaver report involve factually distinguishable incidents where the jacks were used for changing or replacing a tire while the user was not lying underneath the vehicle. Finally, it is not clear whether the jacks from Gallimore and the Beaver report are the same as the Storz cantilever jack in this case. The vehicle in Gallimore was a 525i Sedan and bought in 2002, compared to Alex's 1997 540i Sedan. Doc. 55-3. The Beaver report includes photos of the jack that appear visually similar to the Storz cantilever jack, Doc. 55-4 at 2–3, but the BMW in Beaver was a 1999 model, two years newer than Alex's vehicle, Doc. 55-4 at 1. Plaintiffs bear the burden to show similarity, and this Court cannot find, notwithstanding that Plaintiffs were allowed to supplement the record under Rule 56(d) and even viewing the record in the most favorable light to the Plaintiffs, that these prior incidents are substantially similar to the case at bar.

Questions of foreseeability and misuse are generally reserved for the trier of fact. However, when no reasonable juror could not find misuse then summary judgment for a defendant should enter. See Kampen v. Am. Isuzu Motors, Inc., 157 F.3d 306, 308–09, 317–18 (5th Cir. 1998) (en banc) (affirming summary judgment for defendant when plaintiff used car jack to raise car while he placed his head and shoulders beneath the front of the car to examine the back of a wheel, in direct contravention of the jack's warnings and failed to prove that such use was reasonably anticipated by defendant). That is the case here with Alex's misuse of the Storz cantilever jack in contravention of the express warnings.

**B. Negligence and Negligent Design Claims**

21

Plaintiffs have focused on strict liability theory and have not clearly identified how defendant as distributor was negligent. Nevertheless, there are claims of negligence and negligent design in the complaint. "In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury." Johnson v. Hayman & Assocs., 867 N.W.2d 698, 702 (S.D. 2015) (quoting Hendrix v. Schulte, 736 N.W.2d 845, 847 (S.D. 2007)). "To be liable under a negligence theory, plaintiff must establish that 'a relationship exists between the parties such that the law will impose upon the defendant a legal obligation of reasonable conduct for the benefit of the plaintiff.'" Kendall, 2009 WL 1740008, at \*15 (quoting Estate of Shuck v. Perkins Cty., 577 N.W.2d 584, 586 (S.D. 1998)). A plaintiff must also prove foreseeability of his or her injury because "foreseeability of harm is considered an element of both duty and proximate cause under South Dakota law." Peterson v. Spink Elec. Coop, 578 N.W.2d 589, 592 (S.D. 1998). The Supreme Court of South Dakota noted, however, that "foreseeability for purposes of establishing a duty is not invariably the same as the foreseeability relevant to causation." Id. (quoting Poelstra v. Basin Elec. Power Coop, 545 N.W.2d 823, 827 (S.D. 1996)). "[T]he latter essentially is to be viewed as of the time when the damage was done while the former relates to the time when the act or omission occurred. Negligence must be determined upon the facts as they appeared at the time, and not by a judgment from actual consequences which were not then to be apprehended by a prudent and competent man." Id. (internal citation and quotation omitted). Questions of negligence and proximate cause are for the jury in "all but the rarest of cases." Hertz Motel v. Ross Signs, 698 N.W.2d 532, 538 (S.D. 2005) (quoting Fritz v. Howard Twp., 570 N.W.2d 240, 244 (S.D. 1997)); see also Spink Elec. Coop, 578 N.W.2d at 591.

22

"To establish liability in negligence for defective product design or manufacture, a plaintiff must show that the defendant failed to use the amount of care in designing or manufacturing the product that a reasonably careful designer or manufacturer would use in similar circumstances to avoid exposing others to a foreseeable risk of harm." Kendall, 2009 WL 1740008, at *15 (quoting Burley, 737 N.W.2d at 407). In deciding whether the defendant used reasonable care, courts "must balance what the designer or manufacturer knew or should have known about the likelihood and severity of potential harm from the product against the burden of taking safety measures to reduce or avoid the harm." Id. (quoting Burley, 737 N.W.2d at 407). The presence of a defect in a negligence product liability action may be shown by circumstantial evidence. Id.

In Burley v. Kytec Innovative Sports Equipment, Inc., the Supreme Court of South Dakota explained that whether a defendant in a negligence product liability action knew or should have known of a product's particular risk "involves technical issues which do not easily admit to evidentiary proof and which lie beyond the comprehension of most jurors." 737 N.W.2d at 407. The state court continued:

In particular, a plaintiff must set forth sufficient evidence establishing a causal connection between the design defect and the resulting injury. We do not require that plaintiff eliminate all other possible explanations of causation that the ingenuity of counsel might suggest. A plaintiff need only negate misuse of the product. However, unless it is patently obvious that the accident would not have happened in the absence of a defect, a plaintiff cannot rely merely on the fact that an accident occurred. It is not within the common expertise of a jury to deduce merely from an accident and injury that a product was defectively designed.

Id. (internal citations, quotation marks, and quotations omitted).

Similar to the arguments made regarding Plaintiffs' strict liability claim, Defendant argues that Plaintiffs cannot meet their burden on the negligence claims because Plaintiffs have not offered sufficient expert testimony and cannot prove causation or that the Storz cantilever

23

jack was defective. Doc. 31 at 10, 11–12. Additionally, Defendant argues that Plaintiffs have not shown that it has breached the standard of care or failed to exercise reasonable care in designing or manufacturing the Storz cantilever jack because Defendant did not design or manufacture the Storz cantilever jack. Doc. 31 at 9, 11–12. Plaintiffs counter that Defendant owed Alex a duty of reasonable care because it "could have foreseen that by designing and placing a defective car jack into the stream of commerce could certainly cause injury or death," and that proximate cause exists in this case because there is no question that the jack failed, caused Alex's death, and that it was foreseeable that the jack provided by BMW would cause a vehicle to fall and cause serious injury. Doc. 32 at 17–18. Plaintiffs also maintain that their expert, Lalley, "has submitted scientifically reliable evidence and calculations to support" its negligence claims. Doc. 32 at 9. Plaintiffs contend that Lalley's expert opinion will demonstrate to the jury that Defendant failed to use the necessary amount of care in designing or manufacturing the jack that a reasonably careful designer or manufacture would have used in similar circumstances to avoid exposing others to foreseeable risks of harm, that the jack was not designed in a reasonable manner, and that the likelihood and severity of potential harm was foreseeable, especially given the intended use of the Storz cantilever jack. Doc. 32 at 11.

The same reasons that misuse of product as a matter of law warrants summary judgment on strict liability justify granting summary judgment for Defendants on the negligence and negligence design claim. See Johnson, 867 N.W.2d at 702 (quoting Hendrix, 736 N.W.2d at 847 (stating that proximate and factual causation are essential elements in a negligence action)); Burley, 737 N.W.2d at 407 ("[A] plaintiff must set forth sufficient evidence establishing a causal connection between the design defect and the resulting injury. . . . A plaintiff need only negate misuse of the product." (internal citations, quotation marks, and quotations omitted)). Because

24

no reasonable juror could find that Alex did not misuse the jack, Plaintiffs cannot prove causation under either their negligence or negligent design claim.

Plaintiffs' claims for negligence fail based on contributory negligence as a matter of law. Under South Dakota law, if a plaintiff is contributorily negligent, he may still recover damages where his negligence was slight in comparison with the negligence of the defendant. Wood v. City of Crooks, 559 N.W.2d 558, 559–60 (S.D. 1997); see also SDCL § 20-9-2.[10] "Slight" is defined as "small of its kind or in amount; scanty; meager." Wood, 559 N.W.2d at 560 (quotation omitted) (finding as a matter of law that jury's determination that plaintiff was 30% contributorily negligent "is more than slight" when compared to other defendants combined 70% negligence). Whether a plaintiff's contributory negligence is more than slight typically is a jury issue, but becomes an issue of law under circumstances such as exist here. Id.; see also Schmidt v. Royer, 574 N.W.2d 618, 627 (S.D. 1998) ("In some cases, whether one's contributory negligence was more than slight may be decided as a matter of law."); Westover v. E. River Elec. Power Coop., Inc., 488 N.W.2d 892, 896 (S.D. 1992) ("It is only when the facts show beyond any dispute that plaintiff has committed negligence more than 'slight,' that it is appropriate for the circuit court and this court to hold, as a matter of law, for a negligent defendant."); Lovell v. Oahe Elec. Coop., 382 N.W.2d 396, 399 (S.D. 1986) ("When facts show that the plaintiff, beyond reasonable dispute, was guilty of negligence more than slight, it is the function of the trial court to hold, as a matter of law, for the defendant."). For the reasons that

_____

[10] SDCL § 20-9-2 provides as follows:

> In all actions brought to recover damages for injuries to a person or to that person's property caused by the negligence of another, the fact that the plaintiff may have been guilty of contributory negligence does not bar a recovery when the contributory negligence of the plaintiff was slight in comparison with the negligence of the defendant, but in such case, the damages shall be reduced in proportion to the amount of plaintiff's contributory negligence.

25

apply to misuse of product, Alex's misuse amounts to contributory negligence that is more than slight when compared to that of this distributor Defendant.

## C. Wrongful Death and Breach of Warranty Claims

Plaintiffs' Complaint contains two additional claims, a wrongful death claim and a breach of implied warranty claim referencing the implied warranties of merchantability and of fitness for a particular purpose.[11] Doc. 1-1 at 4–6.

Under South Dakota law, wrongful death actions allow for recovery of damages where a defendant caused "the death or injury of a person . . . by a wrongful act, neglect, or default." SDCL § 21-5-1. Wrongful death recovery hinges on a showing of an underlying tort—be it negligence, strict liability, or otherwise. The wrongful death statute of SDCL § 21-5-1 neither provides independent theory of liability nor saves Plaintiffs' claims from summary judgment under these circumstances.

An implied warranty of merchantability arises when goods are sold by a seller who "is a merchant with respect to goods of that kind." SDCL § 57A-2-314(1). Merchantable goods must be at least "fit for the ordinary purposes for which such goods are used." Id. § 57A-2-314(2)(c). There is an implied warranty of fitness for a particular purpose "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Nationwide Mut. Ins., 855 N.W.2d at 154 (quoting SDCL § 57A-2-315). "[T]he seller must deliver a product that is fit for the purpose for which it is intended," and the plaintiff "must present sufficient evidence, direct or circumstantial, to permit the inference that the product was defective when it left the manufacturer's possession or control." Id. (internal quotation marks

---

[11] Plaintiffs combined implied warranty of merchantability and fitness for a particular purpose in a single breach of implied warranty count. Doc. 1-1.

and quotations omitted). Misuse is a bar to recovery in a breach of warranty case. Herrick, 874
F.2d at 598–99 (interpreting South Dakota law).

Given this Court's determination that no reasonable juror could find that Alex did not
misuse the jack, and the jack was not in a defective condition because Defendant is entitled to
reasonably assume that its warnings in the owner's manual and on the Storz cantilever jack
would be read and heeded pursuant to Restatement (Second) of Torts § 402A comment j, both
the wrongful death and the breach of warranty claims fail. See Herrick, 874 F.2d at 598–99;
Ries, 131 N.W.2d at 579; SDCL § 57A-2-314(2)(c); see also Nationwide Mut. Ins. Co., 855
N.W.2d at 150 ("[T]hose resisting summary judgment must show that they will be able to place
sufficient evidence in the record at trial to support findings *on all the elements* on which they
have the burden of proof." (quotation omitted)).

## V. CONCLUSION

This is a tragic and sad case involving the accidental death of a nice young man with a
tremendous future. The Storz jack is by no means an ideal design and is inferior to certain
scissor jacks. However, even when viewing the facts in the light most favorable to Plaintiffs,
this Court must grant summary judgment under existing law. For good cause and for the reasons
stated above, it is hereby

ORDERED that Defendant's Motion for Summary Judgment, Doc. 28, is granted.

DATED this 17ᵗʰ day of August, 2016.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE

27